## In re J.S.

*John A. Feilding, III,* for appellant.
*John J. Herman,* for Pennsylvania State Police.
*Dennis J. Skayhan,* for Commonwealth.

SCHMEHL, *J.,* February 4, 2011—On April 6, 2010, a warrant for emergency examination and treatment was issued against J.S. The Pennsylvania State Police executed the warrant and transported J.S. to the Reading Hospital & Medical Center emergency room. After examination, J.S. was admitted to the hospital just after midnight on April 7, 2010. On April 8, 2010, the Honorable Mary Ann Campbell issued an order scheduling a hearing before the mental health review officer on April 9, 2010 and appointed the public defender to represent J.S.

Pursuant to the application for extended involuntary treatment, Dr. Hema Iyer indicated that J.S. was brought to the emergency room after he reportedly made comments

that he would retaliate against three co-workers by killing them. This may have been the result of delusional thinking of a persecutory nature. He has become extremely preoccupied with concerns that he is persecuted, which has adversely affected his sleep and work attendance. Dr. Iyer recommended continued in-patient hospitalization for safety while further assessment and evaluation can occur.

At the hearing on the application, the review officer determined that Dr. Iyer's diagnosis for J.S. was psychotic disorder NOS. The testimony reiterated reports of J.S.'s expressing paranoia at work and threatening to kill certain people. There were reports that he was firing guns at imaginary intruders at his home and that he believes he is being persecuted by others who want him to kill himself. He also believed people were aiming laser beams into his home, and he has called the state police multiple times. J.S. denied thoughts of harm to himself or others and denied shooting outside. The hearing officer found that J.S. was severely mentally disabled and in need of treatment. He ordered that J.S. undergo inpatient treatment for a period of up to seven days. The review officer's determination was not appealed by petition to the court.

On July 12, 2010, J.S. filed, with the assistance of private counsel, a petition for review and expungement of mental health commitment for relief pursuant to 18 Pa.C.S.A. §6111.1(g) and for the return of petitioner's firearms. After a number of continuances, a hearing was held thereon on November 9, 2010. By order dated November 10, 2010, the petition was denied. Thereafter, with the assistance of a different attorney, J.S. filed a motion for reconsideration and/or re-opening of the record, which was denied, as well as an appeal to the Superior Court. The court directed J.S.

to file a statement of matters complained of on appeal, which he did timely.

The evidence presented to the court on November 9, 2010 was limited to two witnesses, J.S. and Larry A. Rotenberg, M.D., and two exhibits, the application for involuntary emergency examination and treatment and the application for extended involuntary treatment and associated orders. J.S. testified that he did not threaten any co-workers at his employment nor did he ever say he would retaliate against them. He acknowledged making a comment that he would hire P.I.'s to catch a couple of people and have them prosecuted. He denied being under the care of a psychiatrist or psychologist and denied firing weapons at any time within the last couple of years. He then corrected himself to indicate that he had fired two primers during the month of March 2010. These firearms were seized by the state police. He denied trying to harm himself and he denied making any motions like he wanted to kill himself. He never pointed the firearms at anyone. He also testified that upon his arrival to the hospital, he was seen by a Dr. Good and then Dr. Rotenberg. He claimed it was for about a half an hour.

On cross-examination by counsel for the state police, J.S. testified that he was the victim of harassment. In January, people were firing laser pointers through his windows at night and doing "annoying stuff." He reported the incidents to the state police and also advised that a neighbor had seen tire tracks on his property. J.S. further reported things had been moved within his home. He claimed somebody was entering his home and moving things as if somebody was trying to search the house and that there were numbers written on the insides of his windows.

He believed the activity may have been the result of his former stepson, and perhaps his ex-wife, being involved in drug trafficking. J.S. commented that it was his private investigator's belief that they may have owed somebody money and that was why he was being harassed. J.S. had also reported to police that he had heard people on his roof but that he could never get outside in time to catch them. J.S. also denied threatening to kill himself or others, that he fired guns on his property at imaginary intruders, and that he was delusional. No other evidence was offered on behalf of J.S. and his petition.

Dr. Rotenberg testified that at the beginning of April he received a call and a visit from HR people at J.S.'s employer who were concerned about him and his behavior. They indicated that he had a number of rather peculiar beliefs and that he believed that three people wanted to kill him. They were concerned about his safety and the safety of others. Dr. Rotenberg then contacted Berks County's mental health/mental retardation department and thereafter a warrant was issued.

After a two-and-a-half hour interview of J.S., Dr. Rotenberg believed that J.S. was dangerous, possibly to himself and to others, and so facilitated his admission to the psychiatric unit. Dr. Rotenberg testified that in petitioning for the 302 warrant he was relying on information given to him that J.S. had made threats to kill himself and to harm others, that he had fired guns on his property at imaginary intruders, and that he had not come out of his house for weeks at a time. In reviewing these allegations with J.S. during the interview at the hospital, Dr. Rotenberg believed that J.S. minimized the threats and emphasized threats and injustices to him. Dr. Rotenberg believed the

complaints were so strange and so unusual that they just were not credible. Dr. Rotenberg testified that in addition to the interview of J.S., he contacted a counselor that J.S. had been seeing. The counselor indicated she had worried about J.S. and she thought that perhaps he had paranoid schizophrenia. She was glad he was getting psychiatric attention. Dr. Rotenberg also mentioned J.S.'s belief that people were watching him in his home, that his then-wife was somehow in on the conspiracy against him, and that someone was attempting to extort $30,000.00 out of him. He believed that people at his place of employment were involved, including a friend of fourteen years. J.S. did acknowledge to Dr. Rotenberg that he went out with a handgun into the backyard but insists he never fired it. He reiterated the belief that people were on his roof doing strange things, but by the time he got out of the house nobody would ever be there.

Dr. Rotenberg formed a diagnosis of delusional disorder, paranoid type, with persecutory delusions and personality II disorder NOS with paranoid and obsessive features. He believed J.S.'s ideas appeared to be a poorly formed delusional system with elements of depression and post-traumatic stress disorder. He also had a history of psychosis and using methamphetamine. Dr. Rotenberg believed that the fact that he was not psychotic, outside of his delusional system, was both good news and bad news — good news in the sense that he is not that sick, but bad news in that his delusional system, in combination with good intelligence, a capacity for acting out, technological talent and an ability to plan, makes him much more possibly dangerous.

On cross-examination, Dr. Rotenberg indicated that it

would not surprise him if J.S. had not been medicated, aside from a sedative, because delusional disorders are not particularly responsive to any medication. He also testified that as a result of reports from J.S.'s employer, he had enough concern about the safety of J.S. and his associates that it would not have been responsible for him to ignore it, hence the request for the warrant. Upon J.S.'s arrival at the hospital and after consultation with Dr. Good, the first psychiatrist to evaluate J.S. on April 6, 2010, Dr. Rotenberg evaluated J.S. and it was the totality of the circumstances, and not just the information received from the employer, that caused Dr. Rotenberg to hospitalize J.S. On re-direct, Dr. Rotenberg testified that he had no reason to doubt the reliability of the information received from J.S.'s employer.

Pursuant to 50 P.S. §7302(a)(1), a warrant for emergency examination may be issued "upon written application by a physician...setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment." According to 50 P.S. §7301(a) "a person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself." Clearly a report from an individual's employer to a physician specializing in psychiatry that the individual has been expressing or manifesting signs of suicidal ideation and/or threats of harm to others, coupled with a belief of a conspiracy against him, would constitute reasonable grounds for the physician to believe that the individual poses a clear and

present danger of harm to others or to himself, thereby meeting the test of being severely mentally disabled and in need of immediate treatment. As Dr. Rotenberg so testified, it would have been irresponsible of him to let the report go uninvestigated. Dr. Rotenberg reasonably relied on the reports he received that J.S. made threats of harm against others and, after evaluating J.S. and his credibility, determined that his recent actions, statement and mental state posed a clear and present danger to others which warranted his admission to the psychiatric unit and further examination.

In keeping with statutorily mandated procedure designed to protect the rights of an involuntarily committed individual, application was made to extend J.S.'s involuntary emergency treatment. In accordance with 50 P.S. 7303(c), a hearing was held before a mental health review officer who found that J.S. was a severely mentally disabled individual in need of treatment. No appeal to the court was taken from this determination and, given Dr. Rotenberg's diagnosis of the individual, the court can find no fault in the hearing officer's determination. Based upon the testimony presented on November 9, 2010, the court, too, believed that J.S. presented a clear and present danger to himself and others at the time of the April 2010 proceedings.

Given the totality of the circumstances observed and reported by the mental health professionals, the court has no doubt that the initial warrant for emergency examination and the commitment extension for up to seven days were appropriate. J.S. was provided with all of his due process rights under the Mental Health Procedures Act, which was not challenged as unconstitutional in J.S.'s petition or at

the hearing. The lack of a timely argument regarding the unconstitutionality of the process employed and the lack of a timely objection to the inadmissibility of evidence offered at trial effectively constitute waivers of these issues.

It is also noted that the statement of matters complained of on appeal, number 4, which indicates that the undersigned judge signed the Section 303 commitment, is made in error given that the order was signed by Judge Campbell, hence no conflict of interest or reason for the undersigned to recuse. Additionally, J.S. cites no authority indicating that an ineffective assistance of counsel argument should be applied to the within matter and having had his opportunity with the assistance of counsel to present his case, there is no valid reason to allow J.S. to have multiple hearings.

Finally, regarding complaint number 2 of J.S.'s amended statement of matters complained of on appeal (assuming the complaint has not been waived by its late filing), the court acknowledges that Exhibit 1 indicates J.S. arrived at the hospital at 5:16 P.M. on April 6, 2010 and was not examined until 1:45 A.M. on April 7, 2010. This written report conflicts with the testimony presented to the court by both witnesses, which testimony was not challenged. Dr. Rotenberg testified that he evaluated J.S. at about 7:30 P.M., and both witnesses testified that J.S. was first seen by Dr. Good. After this initial examination, Dr. Rotenberg was consulted and he came in to the hospital to see J.S. Allowing for travel time, it is clear that Dr. Good's evaluation must have occurred within two hours of J.S.'s arrival at the hospital; therefore, no violation occurred.

For the foregoing reasons, the court entered its order of November 10, 2010 and denied the motion for reconsideration.